**Caryn A. McDONAUGH, Petitioner,**

v.

**Michael J. ASTRUE, Commissioner of Social Security,[1] Respondent.**

**No. 05 Civ. 6288(LTS)(DF).**

United States District Court, S.D. New York.

Dec. 2, 2009.

ed as defendant for his predecessor in office, Joanne B. Barnhart, who had been named as defendant in Plaintiff's Complaint.

Pamela Thomas, Fine, Olin and Anderman, New York, NY, for Petitioner.

John E. Gura, Jr., Susan Colleen Branagan, U.S. Attorney's Office, New York, NY, for Respondent.

## MEMORANDUM OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION IN PART

LAURA TAYLOR SWAIN, District Judge.

Plaintiff Caryn McDonaugh ("Plaintiff" or "McDonaugh") brought this action seeking review of a final determination of the Defendant, the Commissioner of Social Security ("Defendant" or "Commissioner"), denying Plaintiff a period of disability and disability insurance benefits under 42 U.S.C. §§ 416(i) and 423(d). On July 6, 2009, Magistrate Judge Debra Freeman issued a Report and Recommendation (the "Report") (docket entry no. 18) recommending that Defendant's Motion for Judgment on the Pleadings (docket entry no. 17) pursuant to Rule 12(c) of the Federal Rules of Civil Procedure be granted and that Plaintiff's Cross–Motion for Judgment on the Pleadings (docket entry no. 12) be denied. Plaintiff filed a timely Notice of Objections to the Report (docket entry no. 19) on July 10, 2009. Defendant filed a Response to Plaintiff's Objections (docket entry no. 20) on July 27, 2009. The Court has reviewed thoroughly the Report, Plaintiff's Objections to the Report, and Defendant's Response. The Court has also reviewed thoroughly the certified copy of the administrative record in this case filed by Defendant (the "Record").

### BACKGROUND

The Report contains a comprehensive summary of the record below and familiarity with that summary is assumed. In addition, the following aspect of the procedural history is relevant to the Court's decision. In the ALJ's findings in the 2002 decision, ALJ Reap stated that "[u]sing Medical–Vocational Rule 201.29 as a framework for decision-making," there are jobs available in the national economy that Plaintiff can perform. Record at 28.

### DISCUSSION

The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C.A. § 636(b)(1) (West 2009). The Court reviews the Report strictly for clear error where no objection has been made and will make a *de novo* determination regarding those parts of the Report to which objections have been made. *Pearson–Fraser v. Bell Atlantic*, No. 01 Civ. 2343(WK), 2003 WL 43367, at *1 (S.D.N.Y. Jan. 6, 2003) (internal citations and quotation marks omitted). However, "objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition will not suffice to invoke *de novo* review of the magistrate's recommendations." *Vega v. Artuz*, No. 97 Civ. 3775(LTS)(JCF), 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002). Further, the objections "must be specific and clearly aimed at particular findings in the magistrate judge's proposal." *Molefe v. KLM Royal Dutch Airlines*, 602 F.Supp.2d 485, 487 (S.D.N.Y.2009).

■ The Court reviews the administrative record to determine if the Commissioner's decision is supported by substantial evidence in the record and is free from legal error. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir.1998).

*Plaintiff's Objections*

Plaintiff's first objection to the Report is that the Report "fails to assess whether or not Plaintiff can sustain work." Docket entry no. 19 at 1. Plaintiff specifically objects to the conclusion that she could perform work-related activities eight hours per day, five days per week, and she objects to the Report's characterization of Dr. Bernanke's testimony. *Id.* at 1–2. Plaintiff also argues that the Report does not adequately consider Social Security Ruling ("SSR") 83–12. *Id.* at 2.

■ Insofar as Plaintiff objects to the weight that the ALJ assigned to the opinion of Dr. Gair, Plaintiff does not raise a new argument and thus is not entitled to *de novo* review on the basis of this objection. *Molefe*, 602 F.Supp.2d at 487. The Court finds no clear error in Judge Freeman's conclusion that the ALJ was permitted to assign less weight to the opinion of Dr. Gair, the treating physician, than to the opinions of the other medical experts. *See, e.g. Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.2004). Further, ALJ Reap specifically noted what evidence was inconsistent with Dr. Gair's opinion in applying the treating physician rule. Record at 23–25. This is sufficient to support the assignment of less weight to Dr. Gair's opinion. *Encarnacion v. Astrue*, No. 06 Civ. 6323(HBP), 2009 WL 2842737, at *14 (S.D.N.Y. Sept. 1, 2009).

■ The Court recognizes that "a claimant need not be an invalid to be found disabled." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir.1998) (citing *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir.1988)).

However, multiple medical experts opined that Plaintiff had the capacity to carry out sedentary work for an eight-hour day, five days per week. ALJ Reap discussed the opinions of Dr. Lathan, Dr. Ha, Dr. Wells, Dr. Maguire, and Dr. Bernanke, as well as Plaintiff's accounts of her daily activities. Record at 23–25. The Court finds that this amounts to substantial evidence that Plaintiff had the capacity to meet the demands of sedentary work. *See Foxman v. Barnhart*, 157 Fed.Appx. 344, 345–46 (2d Cir.2005) (defining substantial evidence as "evidence that a reasonable mind might accept as adequate to support the conclusion reached"). The Court must uphold the ALJ's determination if it is supported by substantial evidence, even though contrary evidence may exist in the record. *Mitchell v. Astrue*, No. 07 Civ. 285(JSR), 2009 WL 3096717 at *14 (S.D.N.Y. Sept. 28, 2009).

■ The Court has thoroughly reviewed the testimony of Dr. Bernanke at the 1997 hearing before ALJ Reap and finds that his expert medical opinion supports the ALJ's findings. Record at 473–481. Dr. Bernanke stated that he believed Plaintiff "had some limitation with respect to sitting[,]" that Plaintiff could lift ten pounds during the period in question, that Plaintiff would have had "some limitations" on standing and walking, and that "it would have been difficulty [sic] in sitting for prolonged periods of ... time." Record at 480. This opinion supports the finding that Plaintiff was capable of some sustained work activity during the period of claimed disability.

■ Substantial evidence supports the ALJ's finding that Plaintiff had the Residual Functional Capacity to perform sedentary work. 20 C.F.R. 404.1545, 404.1567(a) (describing sedentary work). In the step five determination, the Commissioner may

rely on the Medical–Vocational Guidelines (the "grid") to make a finding of disability or non-disability based on factors including a claimant's age, prior work experience, and education, but the existence of non-exertional as well as exertional impairments may make strict reliance on the grid impermissible. *Jordan v. Commissioner of Social Sec.*, 194 Fed.Appx. 59, 61 (2d Cir.2006). In a situation in which there is medical evidence to support a residual functional capacity that suggests a claimant can perform either sedentary or light work, SSR 83–12 recognizes that the individual's further restriction of needing to alternate sitting and standing may limit jobs actually available to the claimant. Soc. Sec. Rul. 83–12 (1983).

 ALJ Reap's decision does not conflict with SSR 83–12 because he considered the testimony of a vocational expert in determining whether or not jobs existed for Plaintiff. SSR 83–12 does not mandate a finding of disability; rather, the Ruling provides that, in the event an individual needs to alternate standing and sitting, a vocational expert should be consulted to specify what jobs are available given this limitation. Ms. Leopold, a vocational expert, testified about what jobs are available for Plaintiff. Record at 481–90. She identified jobs available in the national economy for a person of Plaintiff's age, work experience, and education under two different exertional situations. First, the vocational expert identified jobs for a person who could do sedentary work, sitting six hours, standing two hours, and lifting ten pounds occasionally and five pounds regularly. Second, the vocational expert identified jobs for a person who could sit for four hours and stand for four hours with a stand-sit option, and who had the same lifting limitations as the first hypothetical. This satisfies the requirements of SSR 83–12, and the testimony of Ms.

Leopold constitutes substantial evidence that there are jobs available in significant numbers that Plaintiff is able to perform given her Residual Functional Capacity. *See Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir.1983).

██ The use of the grid in Plaintiff's situation does not require a remand, because the ALJ's decision that jobs existed for Plaintiff is supported by substantial record evidence and is not based primarily on the grid. *See Otts v. Commissioner of Social Sec.*, 249 Fed.Appx. 887, 890 (2d Cir.2007) (finding an inquiry into reliance on the grid unnecessary when the vocational expert's testimony was sufficient to support affirmance). Additionally, the ALJ was permitted to use the grid as a non-exclusive framework for decision-making. 20 C.F.R, Pt. 404, Subpt. P, App. 2 § 200.00(e)(2)(2009). *See Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir.1986).

Plaintiff's second objection is to the Commissioner's treatment of her visual impairment. Plaintiff alleges that the Report and Recommendation should be modified to consider the Social Security Ruling entitled "Evaluating Visual Field Loss Using Automated Static Threshold Perimetry," SSR 07–01p, effective July 31, 2007. Plaintiff also challenges the recommendation of affirmation of the ALJ's decision to deny benefits based on a grid rule despite Plaintiff's visual impairments.

The Court has reviewed the medical opinions in the record relevant to Plaintiff's visual impairments. The relevant period for the determination of disability is April 1, 1996, through December 31, 1996. Record at 16. Dr. Matusow's February 26, 1996, report is the evidence that dates most closely to this period. Record at 215–18. Dr. Matusow performed visual fields, which he found to be "within normal limits." Record at 216. SSR 07–01p applies to visual field losses, which Dr. Matu-

sow did not find during the relevant period.

█ Plaintiff does not appear to object to the step two determination that her visual impairments were not "severe." The ALJ's determination of the extent of the non-exertional limitation of visual impairment under 20 C.F.R. 416.969a(c)(1)(iv) is supported by substantial evidence. The ALJ found that Plaintiff had a "medically determinable myopic disorder" that was correctable with glasses and contact lenses. Record at 19. Additionally, Plaintiff's attorney questioned the vocational expert about the effect of Plaintiff's difficulty seeing on jobs available to her, and the vocational expert testified that Plaintiff could perform the jobs described with corrective lenses. Record at 488. There is substantial evidence to support the ALJ's treatment of Plaintiff's visual impairment as not mandating a finding that Plaintiff could not perform sedentary work.

The Court has also reviewed the portions of Judge Freeman's well-reasoned Report and Recommendation to which Plaintiff has not objected and finds no clear error. Accordingly, the Court adopts Judge Freeman's Report and Recommendation except as to the findings that the ALJ was "entitled to rely on the grid." Report at 41. The Court finds that the ALJ was permitted to use the grid as a "framework for decisionmaking." *Jordan*, 194 Fed.Appx. at 62. The ALJ's decision that Plaintiff has the Residual Functional Capacity to perform sedentary work and the jobs exist in significant number in the national economy that Plaintiff can perform is supported by substantial evidence, and, accordingly, for that reason and the reasons stated in the Report, Plaintiff's motion is denied, Defendant's motion is granted, and the Clerk of Court is respectfully requested to enter judgment in favor of Defendant and terminate this case.

SO ORDERED.

## *REPORT AND RECOMMENDATION*

DEBRA FREEMAN, United States Magistrate Judge.

**TO THE HONORABLE LAURA TAYLOR SWAIN, U.S.D.J.:**

### *INTRODUCTION*

Plaintiff Caryn A. McDonaugh ("Plaintiff") seeks review of the final decision of Administrative Law Judge James B. Reap (the "ALJ") in favor of Defendant, the Commissioner of Social Security ("Defendant" or the "Commissioner"), denying Plaintiff disability insurance benefits under the Social Security Act (the "Act") on the ground that Plaintiff's impairments do not constitute a disability for the purposes of the Act. Defendant has moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings affirming the decision of the ALJ, and Plaintiff has cross-moved judgment on the pleadings reversing the ALJ's decision.

For the reasons set forth below, I respectfully recommend that Defendant's motion for judgment on the pleadings (Dkt. 17) be granted and that Plaintiff's cross-motion (Dkt. 12) be denied.

### *BACKGROUND*

#### A. *Procedural History*

Plaintiff's complaints of disability span a considerable period of time, dating back initially to a back injury she sustained in 1988, while working as an installer for AT & T. (R. at 425, 475.)[2] According to Plaintiff, this injury, together with other medi-

---

**2.** "R." refers to the Record of the administrative proceedings.

cal conditions (including alleged vision and mental health impairments), rendered her unable to continue working as of 1992.[3] (*Id.* at 440.)

Plaintiff first applied for Social Security disability benefits in 1995. (*Id.* at 30–33.) After her application was denied by the Social Security Administration (*Id.* at 35–37), and the denial was upheld on reconsideration (*Id.* at 65–67), Plaintiff sought a hearing before an ALJ. (*Id.* at 68.) An administrative hearing was held on February 4, 1997, before ALJ Reap. (*Id.* at 421–56.) At that hearing, Plaintiff amended her alleged disability onset date to June 25, 1994. (*Id.* at 423–24.)

On March 17, 1997, the ALJ issued a decision in which he determined that Plaintiff was not entitled to receive benefits under the Act. (*Id.* at 312–21.) Plaintiff appealed the ALJ's decision to the Social Security Appeals Council (*Id.* at 325–28), and, on February 26, 1999, her application for remand was granted (*Id.* at 329–32).

A second administrative hearing was held before the ALJ on February 5, 2002 (*Id.* at 459–91), at which time Plaintiff again amended her claim, so as to seek benefits as of an alleged onset date of April 1, 1996. (*Id.* at 459.) Upon an expanded record, including testimony by medical and vocational experts, the ALJ again determined, in a decision dated February 21, 2002, that Plaintiff was not enti-

tled to benefits under the Act. (*Id.* at 12–28.)

Plaintiff requested review of the ALJ's February 21, 2002 decision, but the Appeals Council denied further review, which rendered the decision the final decision of the Commissioner. (*See id.* at 6–9.) Plaintiff then commenced this action, seeking reversal of the decision and remand for the payment of benefits. In this action, Plaintiff principally contends that the ALJ erred by failing to find her disabled due to her back impairment and resulting pain. (*See generally* Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, dated Jul. 24, 2006 ("Pl. Mem.") (Dkt. 13).)

### B. *Plaintiff's Medical History*

#### 1. *Back Injury and Related Impairments*

The medical records that were before the ALJ show that, on July 18, 1988, Dr. Brian H. Gair began treating Plaintiff for a work-related back injury. (R. at 179–202.) Dr. Gair diagnosed Plaintiff with an "acute lumbosacral strain"[4] and sciatica[5] and referred her to physical therapy. (*Id.* at 199.) An X-ray taken on July 18, 1988, revealed "slight dextroscoliosis,"[6] but "no fracture [or] bone destruction." (*Id.* at 226.) On October 4, 1988, Dr. Joseph McCarthy informed Plaintiff, who had been referred by Dr. Gair, that an MRI revealed "abnormalities" to the "L5–S1

---

**3.** Plaintiff has stated that she tried twice to work in 1994, as a sales clerk at Toys R Us and a cashier at A & P, but did not hold either job longer than one day. (*Id.* at 424, 430.)

**4.** "Lumbosacral" refers to the region that encompasses the lumbar vertebrae and the sacrum. J.E. Schmidt, 3–L *Attorneys' Dictionary of Medicine* 4157 (2005).

**5.** "Sciatica" is a condition characterized by pain, tingling, and other sensations in the thigh, leg, or foot. The cause is some kind of

inflammation, pressure, injury, or tension of the sciatic nerve, the largest nerve in the body. 5–S *Attorneys' Dictionary of Medicine* 1238.

**6.** "Dextro" refers to the right. 2–D *Attorneys' Dictionary of Medicine* 2120. "Scoliosis" is an abnormal side-to-side spinal curvature often caused by muscle and bone deformities or unequal muscle contraction. *See* 5–S *Attorneys' Dictionary of Medicine* 1440.

and L4–5 disc levels." (*Id.* at 205.) Each disc showed "partial degeneration" and prolapse, abutting on the S1 nerve root and compromising the L5 nerve root. (*Id.*) In addition, "bilateral facet arthropathy [was] evident."[7] (*Id.*) Dr. Jerome Gristina examined Plaintiff on October 13, 1988, and observed that she "[walked] without difficulty" and "there [was] no evidence of scoliosis." (*Id.* at 203.) Dr. Gristina found, however, that Plaintiff's "back range of motion [was] restricted," "back extension and left lateral bending produc[ed] discomfort," the left foot had loss of sensation and weakness, straight leg raises produced back pain, and the back was tender upon palpation at the right sciatic notch. (*Id.* at 203–04.) The electromyographic studies revealed a possible L5 root irritation. (*Id.* at 204.)

On October 26, 1988, a myelogram was performed, which did not show definite evidence of a herniated disc, although it did reveal minimum bulging discs at L4–5 and L5–S1, as well as extrinsic defects of the discs at those levels and minimal spinal stenosis.[8] (*Id.* at 232–33.) Dr. Nicholas DePalma, a neurosurgeon who saw Plaintiff in conjunction with a state workers' compensation claim, diagnosed mild spinal stenosis, but indicated that Plaintiff could engage in regular activities. (*Id.* at 234.)

On June 12, 1989, Dr. Ronald Bagner, a consulting physician, examined Plaintiff and observed that she walked and got on and off the examination table without difficulty, dressed and undressed without assistance, and appeared comfortable while seated. (*Id.* at 139.) Further, Dr. Bagner noted that Plaintiff could walk on her heels and toes and could flex and extend her spine normally. (*Id.*) Plaintiff complained of pain on left leg straight leg raises. (*Id.*) The lower extremities revealed normal reflexes and no evidence of muscle atrophy or motor abnormalities, but Plaintiff reported decreased sensation to a pin prick in her left foot. (*Id.* at 140.) Lumbar spine X-rays revealed mild dextroscoliosis of the lumbar spine and degenerative disc disease at the L4–L5 disc level. (*Id.*)

On November 15, 1991, Plaintiff had an electromyelogram ("EMG") and nerve conduction study. (*Id.* at 143–47.) Dr. Daniel R. Pack, to whom Plaintiff was referred by Dr. Gair, indicated that the test results were consistent with lumbosacral radiculopathy,[9] and he recommended further radiological investigation. (*Id.* at 147.) Dr. Pack also suggested physical therapy, rehabilitation, and further evaluation by a specialist. (*Id.*)

On February 21, 1992, Plaintiff had an MRI of the lumbosacral spine. (*Id.* at 150.) The study revealed degenerative disc disease at the L4–L5 and L5–S1 discs. (*Id.*) The test also revealed that, at the L5–S1 disc, there was a slight disc herniation mildly deforming the sac and mildly displacing the S1 nerve root. (*Id.*)

In a letter dated June 17, 1992, Dr. DePalma requested authorization from the Workers' Compensation Board to perform a laminectomy on Plaintiff.[10] (*Id.* at 277.)

---

7. "Bilateral" refers to both sides. 1–B *Attorneys' Dictionary of Medicine* 2074. A "facet" is a small, flat surface usually referring to a bone. 2–F *Attorneys' Dictionary of Medicine* 35. "Arthropathy" is any disease of the joints. 1–A *Attorneys' Dictionary of Medicine* 11007.

8. "Stenosis" is a narrowing of the spinal canal, usually caused by degenerative changes. 5–S *Attorneys' Dictionary of Medicine* 5209.

9. "Radiculopathy" is any disease or abnormality of the spinal nerve root. *See* 5–R *Attorneys' Dictionary of Medicine* 218.

10. A "laminectomy" is a surgical procedure where the posterior arch of a vertebrae is

He stated that Plaintiff was "totally disabled for her occupation." (*Id.*) On November 9, 1992, Dr. DePalma again requested authorization for a laminectomy. (*Id.* at 278.)

Undated forms from the New York State Department of Social Services, Office of Disability Determinations, which appear to have been partially filled out by Dr. Gair, report that Dr. Gair treated Plaintiff from December 8, 1988, to June 27, 1995. (*Id.* at 163–70.) The reports state that Plaintiff was limited to lifting and carrying up to five pounds occasionally, and standing and/or walking for fewer than two hours a day. (*Id.* at 165.) Further, Plaintiff reportedly was limited to sitting for fewer than six hours a day, and had limited capacity to push and pull using her lower extremities. (*Id.* at 166.)

On May 23, 1994, Dr. Bagner saw Plaintiff a second time and noted the results of her February 21, 1992 MRI. (*Id.* at 177.) Plaintiff related, at the time, that she had a history of cocaine and heroin use, which began in 1989, and that she also had a history of methadone treatment. (*Id.*) During the visit, Plaintiff complained of low back pain with intermittent numbness in her left leg. (*Id.*) Dr. Bagner noted that Plaintiff walked "with a slow cautious gait," but got on and off the examination table without difficulty, dressed and undressed without assistance, and could walk on her toes and heels. (*Id.* at 178.) He also observed that Plaintiff did not appear to be uncomfortable in the seated position during the interview. (*Id.*) Dr. Bagner's examination revealed that Plaintiff did not have pain with straight leg raises and had no muscle atrophy, abnormal reflexes, or motor or sensory abnormalities. (*Id.*) Dr. Bagner's impression was lumbosacral radiculopathy. (*Id.*)

Dr. Ha, a consulting physician, conducted an orthopedic evaluation of Plaintiff on October 19, 1995. (*Id.* at 219–21.) The exam revealed that Plaintiff walked with a slight limp, had no difficulty getting on and off the examination table, and had minimal difficulty with toe and heel walking. (*Id.* at 220.) Moreover, although Dr. Ha observed back tenderness at the L4–L5 region, he observed no back muscle spasms, no sensory or motor deficiencies, and no muscle atrophy. (*Id.*) An X-ray revealed "[n]o evidence of disc space narrowing," "no loss of vertebral body height," and that Plaintiff's "[l]umbar lordotic curve [was] maintained." (*Id.* at 221.) Dr. Ha diagnosed Plaintiff as obese, with a possible herniation of the L4–L5 and L5–S1 discs. (*Id.* at 220) With respect to Plaintiff's functional capacity for work-related activities, Dr. Ha concluded that Plaintiff was capable of "[s]tanding and walking up to six hours," "[s]itting up to eight hours," carrying and lifting 10 and 20 pounds respectively, and "[p]ushing and pulling light objects." (*Id.*)

In November 1995, Dr. Wells, another consulting physician, examined Plaintiff and determined that she could occasionally lift 50 pounds, that she could frequently lift 25 pounds, that she could stand and/or walk for about six hours and sit for about six hours in an eight-hour workday, that she could push and/or pull without limitation, and that she did not have any postural, manipulative, visual, communicative, or environmental limitations. (*Id.* at 40–47.) Dr. Well's primary diagnosis was low back pain and the doctor's secondary diagnosis was obesity. (*Id.* at 40.)

Dr. William Lathan, also a consulting physician, examined Plaintiff on March 25, 1996. (*Id.* at 238–39.) Dr. Lathan noted that Plaintiff had a history of back pain,

removed. 3–L *Attorneys' Dictionary of Medicine* 562.

sciatica, and chronic substance abuse. (*Id.* at 238.) Dr. Lathan observed that Plaintiff's gait was normal, but slow and cautious, and that she could get on and off the exam table without difficulty. (*Id.* at 238.) An examination revealed that Plaintiff had "[f]ull range of motion in all joints [and] . . . no effusions or inflammations[,] . . . [and that] straight leg raising was normal." (*Id.* at 239.) Dr. Lathan noted that, in addition to having a "back syndrome" and obesity, Plaintiff had an opiate dependence (in remission), chronic methadone dependence, and a history of depression. (*Id.*) With respect to Plaintiff's residual functional capacity, he noted that she could not engage in any lifting, but could stand and walk for six hours out of an eight-hour day. (*Id.*)

On April 5, 1996 Dr. C. Ford, a consulting physician, noted in a Disability Determination and Transmittal that Plaintiff had a functional capacity for light work. (*Id.* at 24, 39.)

On April 8, 1996, Dr. Maguire, a consulting physician, found that Plaintiff could lift and carry up to 20 pounds occasionally, with postural limitations of occasional climbing, balancing, stooping, kneeling, crouching and crawling, and advised that she avoid concentrated exposure to hazardous machinery. (*Id.* at 23–24, 53–64.)

In a report dated February 2, 1997, Dr. Gair, Plaintiff's treating physician, assessed Plaintiff's ability to perform work-related physical activities. (*Id.* at 304–06.) Dr. Gair opined that Plaintiff could lift and/or carry between five and 10 pounds occasionally, stand and/or walk for a total of three to four hours in an eight-hour day, with a maximum of one hour without interruption, and sit for a total of two to three hours in an eight-hour day, with a maximum of 30 minutes without interruption. (*Id.* at 304–05.) He also stated that Plaintiff could not perform any postural activities, and that her movements could decrease depending on weather conditions. (*Id.* at 305–06.) According to Dr. Gair, Plaintiff's limitations were due to L4–L5 and L5–S1 herniated discs. (*Id.* at 306.)

Dr. Vijaya Doddi, a consulting orthopedist, examined Plaintiff on October 6, 2000. (*Id.* at 354–56.) Dr. Doddi observed that Plaintiff did not need help getting on and off the examination table, and that she had normal spinal range of motion, normal joints, and good muscle strength. (*Id.* at 355.) During the examination, Plaintiff complained of lower back pain, and Dr. Doddi noted mild tenderness in the lower back and weakness in the left lower extremities. (*Id.* at 356.) Dr. Doddi's impressions were that Plaintiff had multiple medical problems, a history of drug abuse, chronic lower back pain, hepatitis, and thyroid disease.[11] (*Id.*) Dr. Doddi concluded that Plaintiff could do "light lifting, pushing, pulling and carrying with frequent rest periods and proper biomechanics." (*Id.*)

Plaintiff was seen by Dr. Nicholas Bavaro, a treating physician, on October 12, 2000, for complaints of back pain. (*Id.* at

---

**11.** The administrative record contains clinic notes from White Plains Hospital Center, where Plaintiff was treated for hypothyroidism in 2000. (*Id.* at 369–72.) On January 31, 2000, Plaintiff was seen for an examination where she related a long history of hypothyroidism, beginning when she was 18 months old. (*Id.* at 370.) Plaintiff indicated that she was on Synthroid for her condition, but did not take medication regularly. (*Id.*) It was also noted that Plaintiff had previously refused a request to undergo a liver biopsy, and had also refused to undergo a work-up for hepatitis C. (*Id.*) The physician's impression was hypothyroidism, and he suggested continued use of Synthroid. (*Id.*) Plaintiff did not keep an appointment scheduled for February 2000, and did not return until July 2000. (*Id.* at 371.) The examining physician's opinion remained unchanged at that time. (*Id.*)

390.) Dr. Bavaro diagnosed chronic low back pain and recommended moderate weight loss and a fitness regimen. (*Id.*)

On November 9, 2000, Plaintiff was seen at the Community Hospital at Dobbs Ferry by Dr. Brian Maloney, who examined Plaintiff in connection with her complaints of constant low back pain, which, according to Plaintiff, intermittently radiated down her legs and caused pain in the left paravertebral muscles. (*Id.* at 386.) Dr. Maloney noted that "a good deal of her back pain is mechanical ... and secondary to bulging discs," and he prescribed Celebrex and recommended an MRI. (*Id.* at 387.) A January 2001 MRI of Plaintiff's lumbar spine revealed a herniated disc at L5–S1 and spinal stenosis. (*Id.* at 392.) Plaintiff made follow up visits to Dr. Maloney on February 1, 2001 (*Id.* at 396), and March 29, 2001. (*Id.* at 395.)

### 2. *Vision Impairment*

In claiming disability, Plaintiff has raised not only her back condition, but also vision difficulties and other impairments, although none of these other claimed impairments appear to be the focus of her current challenge to the ALJ's determination.

The first reference in the medical record to Plaintiff's vision is a May 9, 1994, examination of Plaintiff by Dr. Melvin Bronstein, an ophthalmologist. (*Id.* at 173–75.) At that time, Dr. Bronstein stated that Plaintiff's corrected vision with contact lenses was 20/70 in her right eye and 20/30 in her left eye, and determined that Plaintiff had "no visual restrictions." (*Id.* at 173.) His impression was that Plaintiff had myopia and amblyopia in her right eye.[12] (*Id.*)

Two years later, on February 26, 1996, Dr. Gene Matusow, a consulting physician,

examined Plaintiff for visual impairment. (*Id.* at 215–18.) Plaintiff complained of blurred vision. (*Id.* at 215.) Although not entirely clear, it appears that Dr. Matusow found that Plaintiff's best corrected vision was 20/400 in her right eye and 20/100 in her left eye (*id.*), and he opined that Plaintiff had a "significant visual disability." (*Id.* at 216.)

The record further shows that, about three years later, on March 26, 1999, Dr. N. Katz, an ophthalmologist, examined Plaintiff. (*Id.* at 373–74.) It appears from Dr. Katz's records that Plaintiff's corrected vision measured 20/300 in the right eye and 20/100 in the left eye. (*Id.* at 373.) Dr. Katz diagnosed myopic degeneration. (*Id.*)

Finally, Dr. James Duncan, a consulting physician, examined Plaintiff on April 3, 2000 and, in contrast to earlier reports, indicated that Plaintiff's best corrected distance vision was 20/80 in her right eye and 20/70 in her left eye, her best corrected near vision was 20/60 in her right eye and 20/50 in her left eye that her vision with her then present set of lenses was 20/100 in her right eye and 20/80 in her left eye. (*Id.* at 344–45.) Dr. Duncan diagnosed degenerative myopia in both eyes. (*Id.* at 345.)

### 3. *Mental Health and Substance Abuse Issues*

As mentioned above, Plaintiff also had a history of both drug abuse and participation in a Methadone program. In this regard, the record contains treatment notes from the White Plains Hospital Center, where Plaintiff was admitted to a Methadone treatment program on November 9, 1990. (*Id.* at 208–14.)

---

**12.** "Myopia" refers to nearsightedness. 4–M *Attorneys' Dictionary of Medicine* 7266. "Amblyopia" refers to impaired vision not caused by organic disease. 1–A *Attorneys' Dictionary of Medicine* 5385.

On March 2, 1995, a psychiatrist at the New York State Office of Mental Health evaluated Plaintiff. (*Id.* at 48–52.) The psychiatrist noted that Plaintiff's main concern was the custody of her children, who had been removed from her home in October 1994, when Plaintiff had a drug relapse. (*Id.* at 48.) The psychiatrist diagnosed Plaintiff as follows, employing a multiaxial system of assessment:[13] Axis 1—opiod dependence and alcohol dependence in remission; Axis II—adjustment disorder; Axis III—Hashimoto's hypothyroidism[14] and lumbosacral herniation with chronic pain; Axis IV—loss of custody of children; and Axis V—global assessment of functioning ("GAF") of 65.[15] (*Id.* at 49.)

A year later, on March 25, 1996, Dr. Solomon Miskin, a consulting physician, performed a psychiatric evaluation of Plaintiff. (*Id.* at 240–43.) Plaintiff acknowledged that she had used drugs up to one and one-half years earlier, and reported that she had last drunk alcohol three weeks earlier. (*Id.* at 240.) Plaintiff also related a history of physical abuse by her former husband and noted a psychiatric hospitalization in 1982, with subsequent outpatient psychiatric therapy. (*Id.* at 241.) Dr. Miskin observed that Plaintiff was neatly dressed and adequately groomed. (*Id.*) She was alert and oriented and had good eye contact. (*Id.*) Dr. Miskin also noted that Plaintiff showed no evidence of thought disorder and that her affect was "expressive and appropriate." (*Id.*) Moreover, Dr. Miskin found that Plaintiff's concentration, attention, and memory were intact and that she displayed average intellectual functioning. (*Id.* at 241–42.) Dr. Miskin found that, "when sober, [Plaintiff had] a fair ability to understand, carry-out and remember instructions, and a fair ability to respond appropriately to supervision [and] co-workers." (*Id.* at 242.) Dr. Miskin diagnosed Plaintiff as follows: Axis I—chronic and severe poly-substance and alcohol abuse and dependence, moderately severe post traumatic stress disorder, and moderately severe dysthymic disorder;[16] Axis II—dependent traits; Axis III—low back injury in 1988 and re-injury in January 1996; Axis IV—chronic pain syndrome and continued substance abuse, and Axis V—GAF of 70. (*Id.* at 242–43.)[17]

Four years later, on April 10, 2000, Plaintiff was evaluated by Dr. Toula Georgiou, a consulting psychologist. (*Id.* at 346–49.) At that time, Plaintiff complained of difficulty falling asleep and stay-

13. This system involves an assessment on several axes, each referring to a different domain of information. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (2002). Axis I refers to clinical disorders and other conditions that may be a focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions; Axis IV refers to psychosocial and environmental problems, and Axis V refers to a global assessment of functioning ("GAF"). *Id.* A clinician's judgment of an individual's overall level of functioning can be reported using the GAF scale (ranging from 0 to 100). *Id.*

14. "Hashimoto's disease" is an autoimmune disease of the thyroid gland marked by infil-

tration of lymphocytes and antithyroid antibodies. 3–H *Attorneys' Dictionary of Medicine* 596.

15. A GAF of 65 represents mild symptoms that present mild difficulties in social, occupational or school functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (2002).

16. "Dysthymia" is a mood disorder less severe than major depression. 2–D *Attorneys' Dictionary of Medicine* 5402.

17. A GAF of 70 represents mild symptoms that present mild difficulties in social, occupational or school functioning. AMERICAN PSYCHIATRIC ASSOCIATION, *supra* note 11.

ing asleep and described a loss of appetite, but she had no weight loss and did not report any depression, anxiety, panic attacks, manic symptoms, or thought disorders. (*Id.* at 346–47.) On examination, Dr. Georgiou observed that Plaintiff's thought processes were coherent and her affect was full and appropriate. (*Id.* at 348.) Plaintiff's mood was sullen, and her insight and judgment were fair. (*Id.*) Dr. Georgiou found that Plaintiff's intellectual functioning was average and her memory was adequate. (*Id.*) Dr. Georgiou diagnosed a "[h]istory of depressive disorder." (*Id.* at 349.) In terms of functioning, Dr. Georgiou concluded that Plaintiff could "follow and understand simple directions," could perform simple tasks consistently, with or without supervision, and could maintain concentration for tasks. (*Id.* at 348–49.) Dr. Georgiou believed that Plaintiff could relate to others and deal appropriately with stress. (*Id.* at 349.)

### C. *The First Decision of the ALJ*
#### 1. *The Hearing on February 4, 1997*

Plaintiff, represented by counsel, first testified before the ALJ on February 4, 1997. At that hearing, Plaintiff amended her alleged onset of disability from January 13, 1992 to June 25, 1994. (R. at 423.)

Plaintiff testified that she was born on January 30, 1957, and that she had 13 years of education. (*Id.* at 423.) She further testified that she was single and lived with her two children in a first floor apartment. (*Id.* at 427.) Plaintiff stated that her income was $150 a week from workers' compensation and that she received public assistance, both in the form of "Section 8" housing assistance and food stamps. (*Id.*)

Plaintiff also testified that, after 13 years of employment at AT & T, she had stopped work as an installer in 1992. (*Id.* at 440; *see also id.* at 84 (SSA Disability Report, dated June 13, 2005).) In that job,

she had performed a number of diverse tasks, including iron work, running and connecting cable, and installing equipment. (*Id.* at 440) Running cable involved "constant pulling," and she also needed to lift and carry "cable bags," which could weigh a maximum of 55 pounds, although they typically weighed about 30 pounds. (*Id.* at 441–42.)

Plaintiff stated that, in 1996, subsequent to the Social Security Administration's initial denial of her application for disability benefits, she slipped and fell on icy steps. (*Id.* at 424.) Plaintiff testified that she did not realize the steps were icy because she had "the pins and needles in [her] foot again," apparently implying that her original back injury contributed to this re-injury. (*Id.*) Plaintiff further testified that her condition worsened after the fall. (*Id.* at 439.)

Plaintiff testified that she was unable to work because she could not find a job that would accept her absenteeism, which resulted from her back and accompanying leg pain. (*Id.* at 425.) According to Plaintiff, she had attempted work as a clerk and a cashier in 1994, but it was too painful, so she did not work longer than one day at either job. (*Id.* at 430; *see also supra* n. 3.) She said that she "[could] barely move on rainy days," when she would be "all bent over" and unable to walk or "lift anything." (*Id.* at 425.) Plaintiff testified that she saw Dr. Gair, a general practitioner, at least four times a year. (*Id.* at 425–26.) Plaintiff also testified that she wore glasses and contact lenses. (*Id.* at 447.)

Plaintiff explained that, to address her pain, she used a heating pad and a topical "rub" (called "Flexall 454"), and did exercises taught to her by a physical therapist. (*Id.* at 439, 453.) These methods provided her with relief for up to half an hour. (*Id.* at 439.) Plaintiff also took Vicodin, Flex-

eril, and Naprosyn for her pain, but because Flexeril interacted with her methadone treatments and Naprosyn burned her stomach, she only took the medications "as needed." (*Id.* at 432, 438–39.) Plaintiff stated that, about four times a week, she would have to lie down for about an hour during the day, to alleviate the pain. (*Id.* at 453–54.) Plaintiff testified that she had a drug relapse in 1994, which was the last time she had abused alcohol or drugs. (*Id.* at 4334, 438.) She also stated that she had an occasional social alcoholic drink. (*Id.* at 434.)

The ALJ made several inquiries regarding Plaintiff's ability to perform day-to-day activities, eliciting testimony from Plaintiff that she had stopped driving in 1989 because she "couldn't pull [her] foot off the pedal," and therefore either took a cab or had someone drive her to the doctor and the grocery store. (*Id.* at 428.) Plaintiff also testified that she needed her son to help her shop for groceries. (*Id.*) She further explained that she could use the bus, but could not stand, and, when she sat, "the bouncing hurt[ ]." (*Id.* at 429.) Plaintiff stated that she would walk about a mile and a half, three times a week, when she attended the methadone clinic. (*Id.* at 444, 448.) According to Plaintiff, she could cook and wash dishes, but her son helped her put things in the oven, unload the washer and dryer, and empty the trash. (*Id.* at 442–44.) Plaintiff also testified that she could sweep, dust, and make beds, but she could not vacuum. (*Id.* at 443.) She stated that she could no longer play soccer with her children, did not attend church, and "very, very rarely" went to the movies. (*Id.*) Plaintiff further testified that she did not swim because she could not see well enough without her contact lenses. (*Id.* at 445.) Plaintiff stated, though, that she handled her own personal grooming and hygiene. (*Id.*) She testified that, on a nice day, she enjoyed sitting outside and having someone help her plant flowerpots. (*Id.*)

Plaintiff stated that she usually went to bed at 10:00 p.m. and woke between 5:30 and 6:00 a.m. (*Id.* at 445), but that she often woke during the night (*Id.* at 455). She testified that, on average, she had "four or five hours" of sleep a night. (*Id.*) Plaintiff testified that, on a typical day, she would help her children get ready for school, and, if she did not have to attend the methadone clinic, she would read a book or sew. (*Id.* at 446, 448.) Plaintiff also testified that she could stand or walk for about four hours and sit for about three hours in an eight-hour day, but could not do either uninterrupted for those periods of time. (*Id.* at 449.) Plaintiff stated that, since 1988, she had a cane and used it if she was "having a bad day." (*Id.*) Plaintiff also testified that, at least twice a week, she was "incapacitated" by pain and that the "barometric pressure seem[ed] to have something to do with it." (*Id.* at 452.)

### 2. *The ALJ's Initial Findings and Determination*

By Notice of Decision dated March 17, 1997, the ALJ affirmed the Social Security Administration's initial denial of benefits, finding that Plaintiff was not disabled within the meaning of the Act and pertinent regulations. (*Id.* at 315–21.) In particular, the ALJ found that, while Plaintiff could not perform any of her past relevant work and had some visual impairment, she nonetheless retained the residual functional capacity to perform sedentary work. (*Id.* at 319–20.) More specifically, the ALJ found that Plaintiff could lift up to 10 pounds, stand and walk for two hours a day each, sit for six hours a day, and occasionally stoop or crouch. (*Id.*) The ALJ further found that, "based on the objective medical evidence and the [Plain-

tiff's] statements," Plaintiff had "no non[-]exertional limitations." (*Id.* at 318–19.)[18]

In his written decision, the ALJ stated that he had "considered" Plaintiff's complaints of pain and other symptoms, but had not found evidence "suggest[ing] a disorder or combination of disorders that ha[d] significantly limited the [Plaintiff's] ability to function." (*Id.* at 318.) Given that Plaintiff "continue[d] to perform daily activities," that "there [was] no objective medical evidence to establish a continuous back disorder of such severity as to produce disabling pain" and "no evidence that [Plaintiff] ha[d] had any recent visits to the orthopedist for additional medications or testing for her alleged back pain in the recent past," the ALJ found that Plaintiff's allegations regarding her limitations were "not credible." (*Id.* at 318.) Specifically, the ALJ noted that, during examinations, Plaintiff had "no difficulty getting on or off the examining table" (*Id.* at 317–318), did not need a cane (*Id.* at 317), "was not uncomfortable in the seated position" (*id.*), and had a normal gait and a full range of motion (*Id.* at 317–18).

With respect to Plaintiff's participation in a methadone program, the ALJ noted that "due to her progress in the program," Plaintiff was on a "reduced schedule as of January 31, 1997," and, therefore, her methadone use was not considered an impairment. (*Id.* at 318.)

While the ALJ found that Plaintiff was incapable of engaging in her past relevant work as an installer, he determined that Plaintiff had retained the capacity to perform the demands of the full range of sedentary work, without any non-exertional limitations. (*Id.* at 319.) Ultimately,

based on Plaintiff's residual capacity, as well as her age and education, the ALJ concluded that the applicable Medical–Vocational Guidelines, set out in 20 C.F.R. § 404.1569, directed the conclusion that Plaintiff was not disabled. (R. at 320 (citing 20 C.F.R. § 404.1569).)

### 3. *The Remand by the Appeals Council*

On April 28, 1997, Plaintiff appealed the ALJ's decision denying her disability benefits. (R. at 325–26.) On appeal, Plaintiff asserted that, rather than according proper weight to the opinion of Dr. Gair, Plaintiff's treating physician (who, according to Plaintiff, had concluded that she was "unable to perform a full range of sedentary work"), the ALJ had improperly based his decision on a consultive examination, which, Plaintiff argued, "[could not] constitute substantial evidence to deny" her claim. (*Id.* at 327.) In response to the ALJ's finding a lack of objective evidence to establish a back disorder that produced disabling pain, Plaintiff alleged that the ALJ failed to consider "an MRI that was positive for a herniated disc with impingement on the thecal sac[,] as well as an EMG study that revealed radiculopathy." (*Id.*) Moreover, Plaintiff argued that the ALJ had "arbitrarily substitute[d] his own judgment for competent medical opinion," when he failed to consider her treating physician's conclusion that she was "extremely limited in ... sitting, standing and walking." (*Id.*) Thus, Plaintiff asked that the Appeals Council reverse the ALJ's decision or remand the case for further testimony from a vocational expert, so as to permit a full evaluation of her "ability to perform a full range of work with use of a

---

**18.** "Non[-]exertional" impairments are defined as "certain mental, sensory, or skin impairments" or "impairments [which] result solely in postural and manipulative limita-

tions or environmental restrictions." 20 C.F.R. Part 404, Subpart P, Appendix 2, Section 200.0(e).

cane and her inability to sit and stand for prolonged periods of time." (*Id.* at 328.)

On February 26, 1999 the Appeals Council granted Plaintiff's request for review (*Id.* at 330), and remanded her case to the ALJ to "obtain additional evidence concerning the [Plaintiff's] vision and substance dependence," "[g]ive further consideration to the [Plaintiff's] maximum residual functional capacity . . . and provide rationale with specific references to evidence of record in support of the assessed limitations," "obtain evidence from a medical expert to clarify the nature and severity of the claimant's impairments," "if warranted . . . obtain evidence from a vocational expert," and "determine whether drug addiction and alcoholism are contributing factors material to the determination of disability." (*Id.* at 331.)

### D. *The Second Decision of the ALJ*

#### 1. *The Hearing on February 5, 2002*

Following the remand, Plaintiff and her attorney appeared at a supplemental hearing before the ALJ on February 5, 2002. (*Id.* at 457–91.) At the hearing, Plaintiff again amended her alleged onset date of disability, this time from June 25, 1994 to April 1, 1996. (*Id.* at 459.)

At the supplemental hearing, Plaintiff testified that, from April 1996 to December 1996, problems with her back and vision had kept her from working (*Id.* at 462–63), and that she felt "pretty much the same" at the February 5, 2002 hearing as she had felt before (*Id.* at 468). Plaintiff stated that, with glasses or contact lenses, her corrected vision was 20/80 in her right eye and 20/70 in her left eye. (*Id.* at 463.) Plaintiff confirmed that, during the period from April 1996 to December 1996, she was able to cook, wash dishes, sweep, dust, take care of the laundry, shop, walk one-

and-a-half miles three times a week, help her children with homework, read books and newspapers, socialize, sew clothes for her daughter, and manage her children's needs. (*Id.* at 464.) Plaintiff also confirmed that, during that time, she had seen her primary physician, Dr. Gair, three or four times a year (*Id.* at 466), and that she wore a back brace and used a cane (*id.* at 467).

Plaintiff testified that the pain she had experienced in 1996 radiated down her left leg, caused constant "pins and needles" in her right leg, and sometimes traveled from her lower back into both legs. (*Id.* at 468.) Plaintiff stated that her medications took "a little bit of the edge off," but made her tired. (*Id.*) During the period in question, Plaintiff testified that she could sit for only 45 minutes before she felt pain or had to get up or adjust her position. (*Id.* at 470.) Plaintiff stated that, when sitting, she had "pins and needles" in her right leg and pain in her left hip, which extended "sometimes to the knee and sometimes to the ankle." (*Id.* at 471.) Plaintiff testified that, between April and December 1996, she could lift about 20 pounds and had to lie down during the day a little less than at the time of the hearing, which she attributed to the fact that, in 1996, she had been taking 90 milligrams of methadone a day. (*Id.* at 471.)

Dr. Harold Bernakee, a Board-certified internist, testified that he had reviewed Plaintiff's medical data and found "sufficient objective medical evidence of record to allow [him] to form an opinion of [Plaintiff's] medical status during the period April through December [1996]." (*Id.* at 474.) Dr. Bernakee listed Plaintiff's physical and mental impairments as "back pain . . . related to an accident in 1988 while she was employed at AT & T," "a history

of toxemia of pregnancy,"[19] hypothyroidism, hepatitis C, psychiatric evaluation for poly-substance abuse and depression, depression treatment, and "significant myopia, ... [which was] reasonably corrected with the use of lenses." (*Id.* at 475–76.) After detailing Plaintiff's medical record (*Id.* at 476–78), Dr. Bernakee testified that Plaintiff's impairments, taken individually, did not meet or equal in severity or duration any of the impairments listed in Appendix 1 (*Id.* at 479).[20] As for Plaintiff's specific exertional limitations during the period of April to December 1996, Dr. Bernakee stated that Plaintiff would have had difficulty sitting for prolonged periods and some limitations on standing and walking, and could have lifted 10 pounds. (*Id.* at 480.) Dr. Bernakee testified that Plaintiff's methadone use in 1996 "may have helped" her pain. (*Id.* at 480–81.)

Ms. Leopold, a vocational expert, testified that Plaintiff's main occupation was a cable installer, which had heavy physical demands and constituted semi-skilled work under the regulations. (*Id.* at 483.) As for transferable skills, Ms. Leopold stated that, as a cable installer, Plaintiff "needed math skills," "use[d] different types of tools ... [and] electronic test equipment," tested the electronic equipment, read blueprints and schematics, worked with others, followed instructions, completed jobs on a timely basis, and troubleshot problems. (*Id.* at 484.) Ms. Leopold further testified that, if the ALJ assumed that Plaintiff lacked the residual functional capacity to return to her prior job, but was capable of sedentary work, involving sitting for six hours and standing for two hours a day, and lifting 10 pounds occasionally and five pounds frequently, then, despite her mild depression, Plaintiff could work as a dispatcher, assembler, cashier, or ticket seller.[21] (*Id.* at 484–86.) Ms. Leopold also stated, however, that, if the ALJ assumed that Plaintiff could sit for four hours and stand for four hours a day, and did not change the other factors, then Plaintiff's ability to perform those jobs would depend on the environment and on whether the employer would be willing to allow an employee to stand and sit. (*Id.* at 486–87.) Ms. Leopold testified that it would be difficult for Plaintiff to do any job if she needed to lie down during the day, and that any drowsiness caused by her medication would affect her ability to do work. (*Id.* at 488.) Moreover, Ms. Leopold acknowledged that, if, during the relevant time period, Plaintiff had not had the benefit of corrective lenses, then her vision problems would also be a consideration. (*Id.* at 488–89.)

### 2. The ALJ's Supplemental Findings and Determination

By Notice of Decision dated February 21, 2002, the ALJ again concluded that Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 15–16.) The ALJ found that, while Plaintiff was unable to perform any of her past relevant work, she nonetheless retained the "residual functional capacity to perform a significant range of sedentary work." (*Id.* at 27.) More specifically, the ALJ found that, in

---

**19.** The record contains clinic records from Plaintiff's medical treatment during the pregnancy and birth of her child in April 1991 (R. at 99–138), although these do not appear to be relevant to any claim being asserted in this action.

**20.** *See* 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing of Impairments).

**21.** Ms. Leopold testified that there were 15,000 local and 220,000 national dispatcher jobs; 75,000 local and over a million national assembler jobs; 170,000 local and over 3 million national cashier jobs; and 170,000 local and over 3 million national ticket seller jobs in the economy. (R. at 486.)

an eight-hour workday, Plaintiff could lift and carry, push and pull up to five pounds frequently and 10 pounds occasionally, sit for up to six hours, stand for two hours, and walk for two hours, although she should avoid hazardous machinery. (*Id.* at 25.) The ALJ also found "sufficient evidence to support the findings regarding the [Plaintiff's] residual functional capacity." (*Id.* at 28.)

In his decision, the ALJ also stated that, although Plaintiff had a "medically determinable myopic disorder, her vision [was] correctable with glasses and contact lenses," and, therefore, Plaintiff's "vision impairment [was] non-severe." (*Id.* at 19.) The ALJ further noted that Dr. Bernanke had testified that Plaintiff's vision problem was corrected and that Plaintiff had also testified that her vision was "okay." (*Id.*) Additionally, although the ALJ found that Plaintiff had a medically determinable dysthymic disorder, it was non-severe based on evidence of "essentially 'mild' mental findings, [Plaintiff's] varied activities, [and the] lack of any psychiatric limitations." (*Id.* at 21.) With respect to Plaintiff's substance abuse disorder, the ALJ found that, because Plaintiff had amended her alleged onset of disability to coincide with her date of sobriety and the record did not show any active substance abuse since that date, "substance abuse was not material to any disability." (*Id.* at 19.)

In finding that Plaintiff had the "residual functional capacity to perform a significant range of sedentary work" (*Id.* at 27), the ALJ rejected the conclusion by Plaintiff's treating physician, Dr. Gair, that she was precluded from even sedentary work (*id.* at 23). The ALJ determined that Dr. Gair's testimony was not entitled to controlling weight because his opinion was "inconsistent with the opinions from other examining sources," Plaintiff had acknowledged an ability to perform various daily activities, and Plaintiff had medications that "provided relief in controlling [her] symptoms." (*Id.* at 23–25.) The ALJ accepted the testimony of the vocational expert that, based on Plaintiff's age, education, past relevant work experience, and residual functional capacity, Plaintiff could work as a dispatcher, electronic assembler, cashier, or ticket seller. (*Id.* at 26.) In conclusion, the ALJ held that the applicable Medical–Vocational Guidelines directed a finding that Plaintiff was not disabled. (*Id.*)

### E. *The Motions Before This Court*

Currently before the Court are the parties' cross-motions for judgment on the pleadings. In its moving papers, Defendant argues that the ALJ's determination that Plaintiff was not disabled was supported by substantial evidence and that the determination must therefore be upheld. (*See generally* Defendant's Memorandum of Law in Support of her Motion for Judgment on the Pleadings, dated Jun. 22, 2006 ("Def. Mem.") (Dkt. 10); *see also* Reply Memorandum of Law in Further Support of the Commissioner's Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Cross–Motion, dated Aug. 22, 2006 ("Def. Reply Mem.") (Dkt. 15).) Plaintiff, for her part, argues that the record lacks substantial evidence to support the ALJ's determination. (*See generally* Pl. Mem.) In particular, Plaintiff contends that the ALJ (1) distorted the vocational expert's testimony (Pl. Mem. at 15); (2) failed to accord due weight to the opinion of Plaintiff's treating physician (*Id.* at 17); (3) improperly rejected Plaintiff's subjective complaints of pain (*Id.* at 21–23); and (4) incorrectly relied on the Medical–Vocational Guidelines to dictate the conclusion that Plaintiff retained the functional capacity to perform sedentary work, when the Guidelines should have been

found inapplicable because of Plaintiff's non-exertional limitations (*id.* at 23).

## DISCUSSION

## I. APPLICABLE LEGAL STANDARDS

### A. Standard of Review

Pursuant to the Act, the findings of the Commissioner as to any fact, "if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal quotations and citation omitted). Thus, where the Court finds that substantial evidence exists to support the ALJ's determination, the decision will be upheld, even if contrary evidence exists. *See DeChirico v. Callahan,* 134 F.3d 1177, 1182 (2d Cir.1998) (decision affirmed where there was substantial evidence supporting each party); *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990) (reinstating the ALJ's determination, which was supported by substantial evidence). This standard applies to findings of fact, as well as to inferences and conclusions drawn from such facts. *See Levine v. Gardner,* 360 F.2d 727, 730 (2d Cir.1966); *D'Amato v. Apfel,* No. 00 Civ. 3048(JSM), 2001 WL 776945, at *3, 2001 U.S. Dist. LEXIS 9459, at *10 (S.D.N.Y. July 10, 2001).

The Court, however, must also review the ALJ's decision to determine whether the ALJ applied the correct legal standard. *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999). " 'Where an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.' " *Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir.1984) (quoting *Wiggins v. Schweiker,* 679 F.2d 1387, 1389 n. 3 (11th Cir.1982)). Thus, the Court reviews *de novo* whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles. *See id.;* *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987).

### B. The Five–Step Procedure for Evaluating a Claim of Disability

In order to establish entitlement to benefits under the Act, a plaintiff must establish that he or she has a "disability." [22] *See Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998). The term "disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Moreover, under 42 U.S.C. § 423(d)(2)(A):

---

**22.** To be eligible for disability insurance benefits, an claimant must be "insured" for such benefits. 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1); *see also* 20 C.F.R. §§ 404.130, 404.315(a). Thus, in order to qualify for disability benefits, a claimant must establish that she became disabled on or before the expiration of her insured status. *See, e.g., Arnone v. Bowen,* 882 F.2d 34, 37–38 (2d Cir.1989); *Papp v. Comm'r of Soc. Sec.,* No. 05 Civ. 5695(AJP), 2006 WL 1000397, at *7–8, 2006 U.S. Dist. LEXIS 19955, at *21 (S.D.N.Y. Apr. 18, 2006). Here, both parties agree that the relevant period for determining whether Plaintiff is entitled to disability insurance benefits runs from April 1, 1996 (the alleged onset date), to December 31, 1996 (when Plaintiff's insured status expired). (*See* Def. Mem. at 3; Pl. Mem. at 2; R. at 16, 315.)

[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

In evaluating a disability claim, the ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits. *See* 20 C.F.R. § 404.1520; *Diaz v. Shalala,* 59 F.3d 307, 311 n. 2 (2d Cir.1995); *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam). First, the ALJ must determine whether the claimant is engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1520. If not, the second step requires the ALJ to consider whether the claimant has a "severe impairment" that significantly limits his or her physical or mental ability to do basic work activities. *Id.* If the claimant does suffer such an impairment, then the third step requires the ALJ to determine whether this impairment "meets or equals a listed impairment in Appendix 1" of the regulations. *Id.* If the claimant's impairment meets or equals one of those listed, the claimant is presumed to be disabled "without considering the [claimant's] age, education, and work experience." *Id.* If the presumption does not apply, then the fourth step requires the ALJ to determine whether the claimant is able to perform his or her "past relevant work." *Id.* Finally, if the claimant is unable to perform his or her past relevant work, the fifth step requires the ALJ to determine whether the claimant is

capable of performing "any other work." *Id.*

■ In making a determination by this process, the ALJ must consider four sources of evidence: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir.1999) (internal quotations and citation omitted).

■ Under the procedure set out in the governing regulations, "[t]he claimant bears the initial burden of showing that his impairment prevents him from returning to his prior type of employment." *Berry v. Schweiker,* 675 F.2d at 467 (citations omitted); *see* 20 C.F.R. § 404.1520. Once it has been determined that the claimant cannot perform his past relevant employment, the Commissioner then has "the burden of proving that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999) (quoting *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986)); *see also Mimms v. Heckler,* 750 F.2d 180, 185 (2d Cir.1984) ("The burden of proving disability is on the claimant. However, once the claimant has established a prima facie case by proving that his impairment prevents his return to his prior employment, it then becomes incumbent upon the [Commissioner] to show that there exists alternative substantial gainful work in the national economy which the claimant could perform, considering his physical capability, age, education, experience and training.") (citations omitted).

## C. The "Treating Physician" Rule

██ The ALJ must give "controlling weight" to a treating physician's opinion, as long as the treating physician's "opinion on the issue(s) of the nature and severity of [the] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). Where the treating physician's opinion is not entitled to "controlling weight," the ALJ is required to give "good reasons" for not granting it such weight. *Id.*; *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999) ("Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand.") (quoting *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998)).

██ This "requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases even—and perhaps especially—when those dispositions are unfavorable." *Snell*, 177 F.3d at 134. "[T]he ultimate finding of whether a claimant is disabled and cannot work [is] reserved to the Commissioner.... A treating physician's statement that the claimant is disabled cannot itself be determinative.'" *Snell*, 177 F.3d at 133. However, "[r]eserving the ultimate issue of disability to the Commissioner ... does not exempt administrative decision makers from their obligation ... to explain why a treating physician's opinions are not being credited." *Id.* at 134.

## D. Assessments of the Claimant's Credibility

██ The ALJ has discretion to appraise the credibility of witnesses in a hearing for benefits, and to accept or reject the testimony of the claimant concerning subjective complaints of pain or disability. *Mimms*, 750 F.2d at 185–86. If,

however, the ALJ rejects a claimant's subjective testimony, then the ALJ must explicitly state his reasons for doing so with sufficient specificity to enable a reviewing court to determine the legitimacy of those reasons and whether the decision is supported by substantial evidence. *Martone v. Apfel*, 70 F.Supp.2d 145, 151 (N.D.N.Y. 1999) (citing *Brandon v. Bowen*, 666 F.Supp. 604, 608 (S.D.N.Y.1987)).

██ Where an ALJ decides to discount a claimant's subjective allegations of pain, the reviewing court must defer to that credibility assessment, as long as the ALJ's findings are explained and supported by substantial evidence. *See Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir.1984); *see also Bomeisl v. Apfel*, No. 96 Civ. 9718(MBM), 1998 WL 430547, at *6, 1998 U.S. Dist. LEXIS 11595, at *19 (S.D.N.Y. July 28, 1998) (noting that the ALJ's findings as to the claimant's credibility "are entitled to deference because the ALJ had the opportunity to observe the claimant's testimony and demeanor at the hearing").

## II. REVIEW OF THE ALJ'S DECISION

### A. The ALJ Properly Employed the Five–Step Analysis

In this case, the ALJ, after proceeding through each of the steps listed above, determined that Plaintiff was not disabled. First, the ALJ found, and it is undisputed, that Plaintiff had not engaged in substantial gainful work activity since the alleged onset date of her claimed disability, April 1, 1996 (as amended by Petitioner at the second hearing). (R. at 18.) Second, the ALJ concluded that Plaintiff had a severe impairment due to her degenerative disc disease and low back pain (*Id.* at 22), although he found that her vision impairment and dysthymic disorder were non-severe (*Id.* at 19, 21). Third, after thor-

oughly reviewing the medical evidence of record, the ALJ found that, despite subjective evidence of Plaintiff's pain, Plaintiff did not have an impairment that met or equaled in severity the clinical criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 21.) As this meant that Plaintiff was not presumed to be disabled, the ALJ was required to continue to the forth and fifth steps of the analysis. Fourth, the ALJ determined that Plaintiff was incapable of engaging in her past relevant work as an installer, as this job required work that surpassed her residual functional capacity. (*Id.* at 23–25.) Fifth, with the burden shifted to the Commissioner to demonstrate that Plaintiff retained the residual functional capacity to perform substantial gainful work existing in the national economy, the ALJ found that Plaintiff had the functional capacity to perform a significant range of sedentary work under 20 C.F.R. § 404.1567(a). (*Id.* at 27.)

Plaintiff now argues that the ALJ erred at the fifth step of his analysis because the evidence in the record was insufficient to justify a finding that Plaintiff was capable of performing sedentary work. Yet, for the reasons discussed below, this Court finds that the ALJ's conclusion in this regard was, in fact, supported by substantial evidence, and that his ultimate determination that Plaintiff was "not disabled" should therefore be upheld.

**B.** ***The Record Contains Substantial Evidence To Support the ALJ's Determination, at the Fifth Step of the Analysis, That Plaintiff Could Perform Sedentary Work.***

**1.** ***Vocational Expert's Testimony***

The ALJ concluded that Plaintiff was capable of performing simple, sedentary jobs, and, relying on the testimony of a vocational expert, identified specific jobs that Plaintiff could perform. (*Id.* at 26.) The ALJ also relied on Rule 201.29, as set forth in the Medical–Vocational Guidelines at 20 C.F.R. Part 404, Subpart P, Appendix 2, to determine that Plaintiff could perform a number of sedentary jobs. (*Id.*)[23] Plaintiff argues that the Commissioner's decision that she could successfully adjust to the labor market as a sedentary worker was based on a distorted interpretation and use of the vocational expert's testimony. (Pl. Mem. at 15.) Specifically, Plaintiff argues the ALJ "mischaracterized" the vocational expert's testimony and erred because Plaintiff's skills as a cable installer were not transferrable to other jobs. (*Id.*) In addition, Plaintiff contends that, in light of her sedentary restrictions and the vocational expert's conclusion that available work would "depend on the environment," the Commissioner should have—but did not—identify jobs that would have permitted her to sit and stand throughout the course of the work day. (*Id.* at 16.)

With regard to Plaintiff's first argument, while the ALJ and vocational expert found that Plaintiff possessed transferable work skills, the jobs identified by the vocational expert did not require that she use these transferrable skills. Moreover, although Plaintiff argues that "[a]n ability to adjust to sedentary work cannot be reasonably expected where ... [P]laintiff has no transferable skills" (Pl. Mem. at 16), the regulations do not provide that a lack of transferable skills will always rule out the possibility of adjusting to sedentary work. On the contrary, the regulations only state that a lack of transferable skills may rule

**23.** Rule 201.29 of the Commissioner's Medical–Vocational Guidelines applies to a younger person (age 50 or younger), with more than a high school education, and semi-skilled past work. 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 201.59.

out light or sedentary work for individuals age 55 or older. 20 C.F.R. 404.1568(d)(4). This regulation does not apply to Plaintiff, however, because she was younger than 55 during the relevant period. (R. at 423.) Accordingly, Plaintiff's argument is unavailing.

Plaintiff's second argument also fails because, contrary to Plaintiff's assertion that the ALJ did not identify jobs that would permit her to sit and stand throughout the course of the work day, the vocational expert in fact indicated that the sedentary jobs of cashier, assembler, and dispatcher would permit her to sit or stand, if necessary. (*See id.* at 486 (indicating, for example, that a sedentary assembler could stand or sit).) The vocational expert did explain that, if Plaintiff could only sit for four hours, she might not be able to perform certain jobs (*see id.* at 486–87 (noting that this would "depend[ ] on the environment")), but the ALJ ultimately found that Plaintiff could sit for six hours, and so this aspect of the vocational expert's testimony was not material to the ALJ's determination. Moreover, as explained by the Second Circuit, "[t]he regulations do not mandate the presumption that all sedentary jobs in the United States require the worker to sit without moving for six hours." *Halloran v. Barnhart,* 362 F.3d 28, 33 (2d Cir.2004) (rejecting an argument that the need to take breaks or change positions would contradict the Commissioner's regulations defining sedentary work). Thus, it was appropriate for the ALJ to rely on the vocational expert's testimony in finding that jobs existed in both the national and local economy that would meet Plaintiff's residual functional capacity and permit her to both stand and sit, as needed.

### 2. *Treating Physician's Opinion*

Plaintiff argues that the ALJ erred in failing to assign controlling weight to the opinion of her treating physician, Dr. Gair. According to Dr. Gair, Plaintiff was "precluded from even sedentary work" because,

> based on an 8–hour day[, Plaintiff] had the maximum ability to lift and carry 5–10 pounds occasionally, stand and walk uninterrupted for [one] hour, and for a total of 3–4 hours, and sit uninterrupted for 30 minutes for a total of 2–3 hours, with no climbing, stooping, kneeling[,] balancing[,] crouching[,] or crawling.

(R. at 23; *see also* Pl. Mem. at 18–19.) As the ALJ explained, however, most of Dr. Gair's findings were inconsistent with conclusions reached by several other examining physicians and Plaintiff's own testimony regarding her daily activities. (R. at 23–25.) Under the circumstances, the ALJ was permitted to assign less weight to Dr. Gair's opinion than to other opinions in the record that were better supported by the objective medical findings and, in general, were more consistent with the evidence. 20 C.F.R. §§ 404.1527(f), 416.927(f); *see also Schisler v. Sullivan,* 3 F.3d 563, 568 (2d Cir.1993) (noting that the regulations "permit the opinions of nonexamining sources to override treating sources' opinions, provided they are supported by evidence in the record"); *Punch v. Barnhart,* No. 01 Civ. 3355(GWG), 2002 WL 1033543, at *11–13, 2002 U.S. Dist. LEXIS 8882, at *31–37 (S.D.N.Y. May 21, 2002) (where ALJ credited the opinion of a non-treating medical expert over that of a treating physician for the stated reasons that the treating physician's opinion was "not well supported by medically acceptable clinical and laboratory diagnostic techniques" and was "inconsistent with the other substantial evidence" in the record, the ALJ was "following the treating physician regulation rather than ignoring it," as the plaintiff claimed).

For example, the ALJ noted that Dr. Lanthan and Dr. Ha, consulting physicians who examined Plaintiff on March 25, 1996 and October 19, 1995, respectively, both opined that Plaintiff was capable of standing and walking up to six out of eight hours per workday. (R. at 23.) The ALJ also noted that Plaintiff had admitted to Dr. Lanthan that she walked up to two miles per day. (*Id.*) Given this evidence, the ALJ observed that the "noted activities hardly support the standing and walking restrictions proposed by Dr. Gair." (*Id.*)

As to Dr. Gair's opinion that Plaintiff could only lift up to 10 pounds occasionally, the ALJ noted that three consulting physicians had found otherwise: Dr. Ha (who found, in October 1995, that Plaintiff could lift up to 20 pounds), Dr. Wells (who found, in November 1995, that Plaintiff could lift up to 50 pounds occasionally and 25 pounds frequently "with no limitations"), and Dr. Maguire (who found, in April 1996, that Plaintiff could lift and carry up to 20 pounds occasionally, with certain postural limitations). (*See id.*) Further, the ALJ noted that, on April 5, 1996, Dr. Ford had stated that Plaintiff had a functional capacity for light work pursuant to Vocational Rule 202.17. (*Id.* at 24 (citing 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 202.17).)

The ALJ also found Dr. Gair's reports to be less than fully credible based on the expert opinion of Dr. Bernanke. (R. at 24.) After providing a review of the medical evidence, Dr. Bernanke opined that, during the relevant period, Plaintiff had "mild to moderate lumbar radiculopathy," but that she was capable of sedentary work. (*Id.*) The ALJ concluded that this opinion "suggest[ed] that during the pertinent period [Plaintiff] was capable of some sustained work activity and contradict[ed] the restricted functional capacity proposed by Dr. Gair." (*Id.*)

In general, more weight should be accorded to a treating physician's opinion "[t]he more consistent [the] opinion is with the record as a whole." 20 C.F.R. § 404.1527(d)(4). Here, the ALJ correctly pointed out that Dr. Gair's opinion that Plaintiff was precluded from sedentary work was at odds with that of every other professional who had examined Plaintiff or reviewed her medical records. Under the circumstances, it was appropriate for the ALJ to reason that this was a factor weighing against the acceptance of Dr. Gair's conclusions.[24] (*Id.*; *see also Halloran*, 362 F.3d at 32 ("Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts.").)

The ALJ also discredited Dr. Gair's opinion based on Plaintiff's own testimony regarding her "varied daily activities." (R. at 24.) In particular, the ALJ pointed out that Plaintiff had testified that she "performed general household chores (cooking, cleaning, sweeping, dusting, laundry and hanging clothes), sewed clothes for her daughter, and slept 7–8 hours a night of uninterrupted sleep." (*Id.*)[25] Additionally,

---

**24.** Moreover, as the ALJ noted in passing, Dr. Gair's opinion that Plaintiff was precluded from even sedentary work arose from an examination that was "shortly after the expiration of the date last insured" (R. at 23) and was therefore less relevant than opinions rendered during the claimed disability period.

**25.** The ALJ's characterization of Plaintiff's testimony regarding her typical amount of nightly sleep was not entirely accurate, as

the ALJ considered Plaintiff's acknowledgment that she could take care of her children without assistance, which he noted could be "quite demanding both physically and emotionally." (*Id.*) The ALJ also noted that this testimony was verified in several medical reports. (*Id.*) Finally, the ALJ found that, although Plaintiff's use of medications for her alleged impairments weighed in her favor, the "medical records reveal[ed] that the medications provided relief in controlling [her] symptoms." (*Id.* at 25.) Overall, the ALJ determined that the Plaintiff's "daily activities and mode of treatment further cast doubt on the accuracy of Dr. Gair's restricted functional capacity."

Finally, in connection with his decision not to give controlling weight to Dr. Gair's opinion, the ALJ considered, but ultimately rejected, state workers' compensation forms submitted by Dr. Gair, stating that Plaintiff was "totally disabled." (*Id.* at 25.) On this point, the ALJ correctly noted that "reports for other governmental agencies involving a finding of disability are based on their rules and not based on social security law," and, therefore, are not binding in Social Security disability proceedings. (*Id.* (citing 20 C.F.R. § 404.1504).)[26]

In sum, the ALJ determined that Dr. Gair's opinion was not entitled to controlling weight because it was inconsistent with several other physician reports in the record, as well as Plaintiff's own testimony. Under the governing regulations, the ALJ was entitled to discredit Dr. Gair's opinion in these circumstances, and no reversal on this ground is required.

Plaintiff testified that she "woke through the night all the time" (*Id.* at 455), but was somewhat accurate, in that Plaintiff testified that she was "usually in bed ... at 10:00 [p.m.]," and "usually w[o]ke up between 5:30 and 6:00 [a.m.]" (*Id.* at 445).

### 3. *Plaintiff's Subjective Complaints of Pain*

Plaintiff also argues that the ALJ's "explicit rejection of [P]laintiff's subjective [complaints]" was improper. (Pl. Mem. at 22.) According to Plaintiff, two MRIs, an EMG, X-rays, and a myelogram all showed defects of the L4–5 and L5–S1 discs and provided "substantial objective evidence of [her] back injury." (*Id.*) Plaintiff appears to argue that this objective medical evidence demonstrated the presence of a medical impairment and thereby supported her allegations of pain. (*Id.* at 21–22.)

What Plaintiff misses with this argument is that the ALJ did not fully discredit Plaintiff's testimony regarding her pain and functional limitations, but rather discounted only her allegations "of *totally debilitating symptoms*," in light of the reports of consulting physicians and Plaintiff's own admissions regarding her "varied daily activities and mode of treatment," as discussed above. (R. at 25; *see supra* at 568–69.) Although Plaintiff now argues that the ALJ misunderstood or mischaracterized her testimony, the ALJ, in fact, gave a fair summary of Plaintiff's descriptions of her regular activities. Plaintiff does not dispute that she had been able to use public transportation and to concentrate on sedentary activities, such as reading or sewing. Plaintiff does take issue with the ALJ's finding that she had been able to care for her "young children" (R. at 24), given her testimony that her son (at age 15) needed to assist her with the care of her daughter (at age 5) (Pl. Mem. at 20 (citing R. 427–28, 442–46)). Yet Plaintiff

26. Further, the Court notes that all of the workers' compensation forms submitted by Dr. Gair, and the opinions contained therein, predated Plaintiff's alleged onset date of disability, as amended. (*See* R. at 179–202; 279–99.)

did testify that she had been able to make her daughter breakfast before school and help her son with homework, and that, apart from child care, she regularly performed many household chores unassisted. (*See* R. at 442–43, 446, 448.) Under the circumstances, the ALJ was justified in noting that Plaintiff had conceded an ability to perform daily tasks unassisted and to care for her children without "particular assistance." (*Id.* at 24.)

Viewing the ALJ's decision as a whole, it is apparent that his decision to discount Plaintiff's subjective complaints of pain was supported by substantial evidence and is thus entitled to deference. *See Howe– Andrews v. Astrue,* No. CV–05–4539(NG), 2007 WL 1839891, at *10, 2007 U.S. Dist. LEXIS 46568, at *29 (E.D.N.Y. June 27, 2007) (upholding, as supported by substantial evidence, the Commissioner's decision to discount the plaintiff's testimony, as that testimony was inconsistent with, *inter alia,* the medical evidence and plaintiff's own activities during the relevant period); *Arteaga v. Astrue,* No. 06 Civ. 1244(PKC), 2007 WL 2402871, at *16–17, 2007 U.S. Dist. LEXIS 60334, at *47 (S.D.N.Y. Aug. 15, 2007) (affirming the ALJ's finding of non-disability where plaintiff's knee pain allegedly worsened with prolonged walking, but where plaintiff was able to engage in activities such as watching television, reading, doing household chores, and buying groceries); *see also Gernavage v. Shalala,* 882 F.Supp. 1413, 1419 n. 6 (S.D.N.Y. 1995) (finding that "deference should be accorded to the ALJ's credibility determination because he heard plaintiff's testimony and observed his demeanor").

### 4. *The ALJ's Use of the Medical– Vocational Guidelines (the "Grid")*

Plaintiff's final argument is that the ALJ erred in concluding that Plaintiff was capable of performing sedentary work because

Defendant did not meet its burden of proof on this point. (*See* Pl. Mem. at 23.) Under the procedure set out in the Commissioner's regulations, once it has been determined that the claimant cannot perform his or her past relevant employment, the burden shifts to the Commissioner to demonstrate that the claimant is capable of performing any other work. *See* 20 C.F.R. § 404.1520; *see also Mimms,* 750 F.2d at 185 ("[O]nce the claimant has established a prima facie case [of disability] by proving that his impairment prevents his return to his prior employment, it then becomes incumbent upon the [Commissioner] to show that there exists alternative substantial gainful work in the national economy which the claimant could perform, considering his physical capability, age, education, experience and training.") (citations omitted). In determining whether the Commissioner has met this burden of proof, the ALJ, under appropriate circumstances, may rely on the Medical–Vocational Guidelines contained in Appendix 2 of 20 C.F.R. Part 404, Subpart P, commonly referred to as the "grid." *See Zorilla v. Chater,* 915 F.Supp. 662, 667 (S.D.N.Y. 1996).

The grid "takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the [grid] indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy." *Id.* As a general matter, the result listed in the grid is "dispositive on the issue of disability." *Id.* (citation omitted). Exclusive reliance on the grid, however, "is inappropriate where the guidelines fail to describe the full extent of the claimant's physical limitations." *Jones v. Apfel,* 66 F.Supp.2d 518, 523 (S.D.N.Y. 1999) (citing *Montes–Ruiz v. Chater,* No. 97–6013, 1997 WL 710607, at *2, 1997

U.S.App. LEXIS 32217, at *7 (2d Cir. Nov. 14, 1997)).

In this case, the ALJ relied on the grid to determine that Plaintiff was able to perform sedentary work. Plaintiff claims that this was error because she suffers from "non[-]exertional" impairments (*i.e.* an inability to bend, stoop or crouch, and pain) that render the grid inapplicable. (*See* Pl. Mem. at 23.) "A non[-]exertional limitation is one imposed by the claimant's impairments that affects her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain." *Rosa*, 168 F.3d at 78 n. 2 (citation omitted); *see* 20 C.F.R. §§ 404.1569a(a), (c). Non-exertional impairments are those that "affect plaintiff's ability to perform any activity, strength related or not. They do not manifest themselves only when the plaintiff exerts himself physically, but are present at all times." *Graham v. Heckler*, 580 F.Supp. 1238, 1241 (S.D.N.Y.1984) (citation omitted).

The Second Circuit has established that "if a claimant's non[-]exertional impairments 'significantly limit the range of work permitted by his exertional limitations' then the grid[ ] obviously will not accurately determine disability status because they fail to take into account claimant's non[-]exertional impairments" and "application of the grid[ ] is inappropriate." *Bapp*, 802 F.2d at 605–06 (citation omitted). Further, "in a case where both exertional and non[-]exertional limitations are present, the guidelines cannot provide the exclusive framework for making a disability determination." *Id.* The phrase "significantly limit" means "the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id.* at 606. In order for the

grid to be inapplicable here, Plaintiff would have to have shown that her inability to bend, stoop, or crouch, together with her pain, so limited her possible range of work that she was unable to perform substantially gainful work. *See Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983).

In this case, the ALJ found that Plaintiff was limited in her ability to perform past work as an installer, which required lifting up to 50 pounds and standing for five hours (R. at 25), but that she had "residual functional capacity to perform a significant range of sedentary work (*Id.* at 23). According to the SSA's rulings, although an inability to bend, stoop, crouch, or kneel more than occasionally would substantially affect an individual's ability to perform most medium, heavy, and very heavy jobs, such limitations would not substantially affect an individual's ability to perform light or sedentary work. *See* Social Security Ruling 85–15, 1985 WL 56857, at *2–3, 1985 S.S.R. LEXIS 20, at *5–6 (S.S.A. 1985). Thus, to the extent that Plaintiff's *non-exertional impairments* consisted of an inability to engage in prolonged or repeated bending, stooping, and crouching (whether because of her physical inability to perform these activities or because of pain experienced during such activities), the ALJ's conclusion as to Plaintiff's ability to perform sedentary work was supportable, and his use of the grid was appropriate.

Further, to the extent that Plaintiff contends that her pain itself constituted a nonexertional impairment, the ALJ, as discussed above, had an adequate basis for discounting Plaintiff's subjective complaints of pain. Thus, on the record presented, the ALJ was permitted to find that Plaintiff's alleged pain was not a significant non-exertional impairment that made the grid inapplicable. *See Rodriguez v.*

*Apfel,* No. 96 Civ. 8330(JGK), 1998 WL 150981, at \*10, 1998 U.S. Dist. LEXIS 4057, at \*37 (S.D.N.Y. Mar. 31, 1998) (upholding the ALJ's determination that plaintiff's complaints that her pain constituted a non-exertional limitation sufficient to prevent her from performing sedentary work were not credible where the ALJ "specifically referenced the plaintiff's complaints in her decision, and examined whether there was medical evidence to support them").

Accordingly, the ALJ was entitled to rely on the grid in reaching his conclusion that Plaintiff was "not disabled" based on her education, age, and ability to meet the exertional demands of sedentary work. (R. at 26.) As the record contains substantial evidence to support this ultimate conclusion, it should be upheld by this Court.

### *CONCLUSION*

For the forgoing reasons, I respectfully recommend that Defendant's motion for judgment on the pleadings (Dkt. 17) be granted and that Plaintiff's cross-motion (Dkt. 12) be denied.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Laura Taylor Swain, United States Courthouse, 500 Pearl Street, Room 755, New York, N.Y. 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, N.Y. 10007. Any requests for an extension of time for filing objections should be directed to Judge Swain. FAILURE TO OBJECT WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Laura Taylor Swain, United States Courthouse, 500 Pearl Street, Room 755, New York, N.Y. 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, N.Y. 10007. Any requests for an extension of time for filing objections should be directed to Judge Swain. FAILURE TO OBJECT WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).